# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| THE ROMAN CATHOLIC DIOCESE OF DALLAS, | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 3:12-CV-1589-B |
| KATHLEEN SEBELIUS, HILDA SOLIS, TIMOTHY GEITHNER, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, U.S. DEPARTMENT OF LABOR, and U.S. DEPARTMENT OF TREASURY, | § § § § § § § § | |
| Defendants. | § | |

## MEMORANDUM OPINION & ORDER

Before the Court is Defendants' Motion to Dismiss for Lack of Jurisdiction (doc. 9), filed August 6, 2012. Finding that the Plaintiff has standing to bring this suit, the Court nonetheless concludes that the issues raised in the Complaint are not ripe for review. Accordingly, the Court **GRANTS IN PART and DENIES IN PART** Defendants' Motion as follows.

## I.

## BACKGROUND

In one of many similar cases threading their way through the federal courts, Plaintiff The Roman Catholic Diocese of Dallas has sued the United States Departments of Health and Human Services ("HHS"), Labor, and Treasury, as well as their respective Secretaries, Kathleen Sebelius, Hilda Solis, and Timothy Geithner in their official capacities (collectively, "Defendants"), to

challenge certain provisions of the Patient Protection and Affordable Care Act ("ACA"), Pub. L. No. 111-148, 124 Stat. 119 (2010), as amended by the Health Care and Education Reconciliation Act, Pub. L. No. 111-152, 124 Stat. 1029 (2010), and the regulations issued by each of the Defendants implementing it. Specifically, Plaintiff avers that the ACA and its implementing regulations, once enforced, will require Plaintiff to provide its employees with health insurance coverage for services and medications that defy the religious tenets held by Plaintiff. Plaintiff files this pre-enforcement challenge to the ACA for declaratory and injunctive relief.

A.    *Statutory and Regulatory Background*

In March 2010, Congress enacted the Patient Protection and Affordable Care Act ("ACA"), Pub. L. No. 111-148, 124 Stat. 119 (2010), which was amended by the Health Care and Education Reconciliation Act, Pub. L. No. 111-152, 124 Stat. 1029 (2010) (collectively referred to as the "ACA"). The ACA established requirements for insured and self-insured "employee welfare benefit plans," as defined in the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1002(1). *See* 42 U.S.C. § 300gg-91(a)(1). Under the ACA, the group health plans must provide coverage for women's "preventive care and screenings" as defined by the comprehensive guidelines set forth by the Health Resources and Services Administration ("HRSA"), an agency within the HHS. 42 U.S.C. § 300gg-13(a). The "preventive care" coverage may not impose any cost-sharing requirements on the patient. 42 U.S.C. § 300gg-13(a)(4). Should an employer violate the ACA, it may be subject to monetary fines under the Internal Revenue Code, 26 U.S.C. §§ 4980D(b), 4980H(a), (c)(1); Health Insurance Portability and Accountability Act, 42 U.S.C. § 300gg-22(b)(2)(C)(i); and ERISA, 29 U.S.C. § 1132(a)(1)(B). The health care requirements are waived for "grandfathered" group health plans, which are generally defined as plans that existed prior to

March 23, 2010 and have not undergone designated changes. 26 C.F.R. § 54.9815-1251T(a)(1)(i) (Treasury); 29 C.F.R. § 2590.715-1251(a)(1)(i)(Labor); 45 C.F.R. § 147.140(a)(1)(i)(HHS).

On July 19, 2010, the government issued interim final rules implementing the preventive services coverage provision and announced that HHS was developing the HRSA-supported comprehensive guidelines to define preventive care coverage under the ACA. 75 Fed. Reg. 41,726 (July 19, 2010). HHS commissioned the government-funded Institute of Medicine to recommend the substance of the guidelines. The Institute of Medicine recommended that "preventive care" should include Food and Drug Administration-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity.[1] *See* Inst. of Med., Clinical Preventive Services for Women: Closing the Gaps (2011). On August 1, 2011, the Defendants adopted the guidelines advanced by the Institute of Medicine. 76 Fed. Reg. 46,621 (Aug. 3, 2011).

On August 3, 2011, the HRSA also implemented an amendment that exempted certain religious employers from the comprehensive guidelines and requirements to cover contraceptive services. *Id.*; 45 C.F.R. § 147.130(a)(1)(iv)(A). The regulation defined a "religious employer" as:

> an organization that meets all of the following criteria:
> (1) The inculcation of religious values is the purpose of the organization.
> (2) The organization primarily employs persons who share the religious tenets of the organization.
> (3) The organization serves primarily persons who share the religious tenets of the organization.
> (4) The organization is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as

---

[1]Employers are not required to cover abortion services, 42 U.S.C. § 18023(b)(1)(A)(i), and federal agencies will lose funding should they require that an employer provide coverage for abortions. Pub. L. No. 112-74, 125 Stat. 786 (2011); Exec. Order 13535, 75 Fed. Reg. 15,599 (Mar. 24, 2010).

amended.[2]

45 C.F.R. § 147.130(a)(1)(iv)(B). Together, Defendants adopted this version of the religious employer exemption in the final regulations on February 15, 2012.

Aware that some religious entities may not qualify for the "religious employer" exemption, the government issued a bulletin announcing a one-year "temporary enforcement safe harbor" for certain non-profit organizations. An organization meeting the following criteria is said to be safe from enforcement during the safe-harbor period: (1) the employer is a non-exempt, non-profit organization, (2) due the organization's religious objections, the health care plan has not offered contraceptive coverage from February 10, 2012 onward, (3) the plan year begins between August 1, 2012 and August 1, 2013, and (4) the organization self-certifies that it meets the above criteria. HHS, Guidance on the Temporary Enforcement Safe Harbor, at 3 (Feb. 10, 2012); 77 Fed. Reg. 8725, 8728 (Feb. 15, 2012); 77 Fed. Reg. 16,501 (Mar. 21, 2012). The purported purpose of the one-year safe-harbor provision was to give the government time "to develop and propose changes to the[] final regulations that would meet two goals–providing contraceptive coverage without cost-sharing to individuals who want it and accommodating non-exempted, non-profit organizations' religious objections to covering contraceptive services." *Id.* at 8727. The safe harbor began February 10, 2012 and continues through the first plan year for any plan that begins on or before August 1, 2012, effectively protecting qualified entities from enforcement until their new plan year initiating on or after August 1, 2013. The government pledges to work with non-exempt religious organizations to issue amended regulation(s) that accommodate religious coverage concerns. *Id.* at 8728-8729.

---

[2] Internal Revenue Code § 6033(a)(3)(A)(i) and (iii) apply to "churches, their integrated auxiliaries, and conventions or associations of churches" and "the exclusively religious activities of any religious order."

On March 21, 2012, the government published an Advanced Notice of Proposed Rule Making ("ANPRM"), notifying the public of its intent to reconsider the ACA implementing regulations, including ways to accommodate non-exempt religious organizations. 77 Fed. Reg. 16,501 (Mar. 21, 2012). The ANPRM stated that the departments "intend to finalize these amendments to the final regulations such that they are effective by the end of the temporary enforcement safe harbor." *Id.* at 16,503. The ANPRM recognized the need to "to help identify issues relating to the accommodation to be developed with respect to non-exempt, non-profit religious organizations with religious objections to contraceptive coverage." *Id.* The ANPRM further outlined the process for amendment, including an ANPRM comment period, publication of an proposed rule, a comment period on the proposed rule, and promulgation of amended final regulations. *Id.*

When this action was filed, no actual or concrete proposals to amend the ACA implementing regulations had been promulgated, though the government had made numerous public statements that the proposed amendments would be finalized in the first quarter of 2013. Doc. 31-1, Resp. to Notice at 3 n.3. The government had also represented to numerous federal courts that amendment would be forthcoming and that they would never enforce the current regulations against certain non-exempt religious entities. *See, e.g.*, *Wheaton Coll. v. Sebelius*, No. 12-5273 and 12-5291, 703 F.3d 551, __, 2012 U.S. App. LEXIS 26716, at *7-8 (D.C. Cir. Dec. 18, 2012).

Approximately eight months after Plaintiff filed this action and five months after Defendant's Motion to Dismiss was fully briefed, Defendants issued a Notice of Proposed Rulemaking ("NPRM"), 78 Fed. Reg. 8456 (Feb. 6, 2013). The NPRM offers a proposed amendment to the ACA implementing regulations and requests comment on the same. The NPRM comment period remains open until April 8, 2013. *Id.* Among other suggestions, the NPRM outlines an amended definition

of "religious employer" for the exemption at 45 C.F.R. § 147.130(a)(1)(iv)(B). The proposed amendment eliminates the first three prongs of the religious employer test, requiring only that the employer "is organized and operates as a nonprofit entity and referred to in section 6033(a)(3)(A)(i) or (iii) of the [Internal Revenue] Code." 78 Fed. Reg. at 8461. The explained purpose of the amendment is as follows: "[T]he proposed rules would amend the criteria for the religious employer exemption to ensure that an otherwise exempt employer plan is not disqualified because the employer's purposes extend beyond the inculcation of religious values or because the employer serves or hires people of different religious faiths." *Id.* at 8459. The NPRM also declares that "[t]he Departments intend to finalize all such proposed amendments before the end of the temporary enforcement safe harbor." *Id.* at 8459.

B.    *The Roman Catholic Diocese of Dallas*

Plaintiff is a nonprofit organization existing under the Code of Canon Law of the Roman Catholic Church. Doc. 1, Compl. ¶ 15. It operates seventy-four parishes and quasi-parishes, thirty-eight elementary and secondary schools, and other 501(c)(3) charitable enterprises in the Dallas, Texas area. *Id.* ¶ 27. Plaintiff provides its benefits-eligible employees with a self-insured health plan through which Plaintiff underwrites employee health costs using a third-party plan administrator, Aetna. *Id.* ¶ 41. Plaintiff's religious principles do not support the use of "abortion-inducing drugs," the "facilitation of sterilization services," "contraception," or related counseling services. *Id.* ¶¶ 2, 4. As such, Plaintiff's employee health care plan does not presently include coverage for those services. *Id.* ¶ 42.

Plaintiff certifies that its health care plan does not meet the definition of a "grandfathered" plan under 26 C.F.R. § 54.9815-1251T(a)(1)(i) (Treasury); 29 C.F.R. § 2590.715-

1251 (a) (1) (i) (Labor); 45 C.F.R. § 147.140 (a) (1) (i) (HHS). *Id.* ¶43. Plaintiff maintains that it "does not know" whether it falls within the protection of the current regulatory exemption for religious employers, because under the second and third prongs of that definition, religious employers must primarily employ and serve persons who share the organization's faith.[3] 45 C.F.R. § 147.130 (a) (1) (iv) (B). Plaintiff's Catholic mission, however, requires it to hire and serve non-Catholics. For example, Plaintiff operates parochial schools that educate over 15,000 students; in one such establishment, Bishop Dunne Catholic School, half of its students are non-Catholics. *Id.* ¶¶ 32, 34. Plaintiff also oversees significant social service work for the homeless, immigrants, and the elderly, but does not keep records of the persons served nor request to know their religious affiliation. *Id.* ¶¶ 36-37. Third, Plaintiff employs 90 benefits-eligible employees at its Pastoral Center and approximately 1,300 benefits-eligible teachers, but Plaintiff similarly does not request nor keep track of its employees' religious affiliation. *Id.* ¶ 37. Because it serves and employs non-Catholics, Plaintiff fears that it would not qualify for an exemption under the ACA implementing regulations and will be forced to provide coverage for services involving artificial interference with the creation of human life, contrary to its sincerely-held values and religious beliefs. *Id.* ¶ 9. Plaintiff does not dispute that it qualifies for the temporary enforcement safe harbor and thus will not be required to comply with the ACA coverage mandates until January 1, 2014, when its health care plan year begins.

C.    *Federal Cases Reviewing ACA Challenges*

Numerous federal district courts have been faced with nearly identical ACA challenges by

---

[3]Given the recency of the NPRM, Plaintiff has not taken a position as to whether it would fall under the religious employer exemption proposed in the NPRM. However, Plaintiff admits that "[i]t is organized exclusively for charitable, religious, and educational purposes within the meaning of Section 501 (c) (3) of the Internal Revenue Code." Doc. 1, Compl. ¶ 15.

Catholic entities, universities, and other religiously-oriented groups. The vast majority of cases have found that challenges to the ACA and the regulations are nonjusticiable because the plaintiffs lack standing and the claims are unripe. *See Archdiocese of St. Louis v. Sebelius*, No. 4:12-CV-00924-JAR, 2013 WL 32926 (E.D. Mo. Jan. 29, 2013); *Univ. of Notre Dame v. Sebelius*, No. 3:12CV253RLM, 2012 U.S. Dist. LEXIS 183267 (N.D. Ind. Dec. 31, 2012); *Zubik v. Sebelius*, No. 2:12-CV-00676 (W.D. Pa. Nov. 27, 2012); *Catholic Diocese of Nashville v. Sebelius*, No. 3-12-0934, 2012 U.S. Dist. LEXIS 166152 (M.D. Tenn. Nov. 21, 2012); *Legatus v. Sebelius*, No. 12-12061, 2012 U.S. Dist. LEXIS 156144 (E.D. Mich. Oct. 31, 2012) (Catholic organization did not have standing, but private individual did; ripeness not at issue); *Nebraska v. HHS*, 877 F. Supp. 2d 777 (D. Neb. 2012). Only two courts have found the challenge justiciable. *Roman Catholic Diocese of Fort Worth v. Sebelius*, No. 4:12-CV-314-Y (N.D. Tex. Jan. 31, 2013); *Roman Catholic Archdiocese of N.Y. v. Sebelius*, No. 12 Civ. 2542 (BMC), 2012 U.S. Dist. LEXIS 172695 (E.D.N.Y. Dec. 4, 2012) (finding justiciable a non-profit's ACA challenge, but dismissing the claims by the Diocese and Catholic Charities for lack of standing). The only circuit court to review an ACA decision held that the plaintiffs had standing to challenge the ACA and implementing regulations, but determined that the issues were not ripe given the government's representations that the regulations would be amended. *Wheaton Coll.*, 703 F.3d at 551 (holding case in abeyance rather than dismissing it).[4] Following the D.C. Circuit Court's ruling, several courts avoided deciding ACA challenges based on standing, but granted dismissal on ripeness grounds. *See Roman Catholic Archbishop of Wash. v. Sebelius*, No. 12-0815, 2013 WL 285599

---

[4]The Circuit Court consolidated and reversed in part *Belmont Abbey Coll. v. Sebelius*, No. 11-1989 (JEB), 2012 U.S. Dist. LEXIS 125519 (D.D.C. Sept. 5, 2012), and *Wheaton Coll. v. Sebelius*, No. 12-1169 (ESH), 2012 U.S. Dist. LEXIS 120187 (D.D.C. Aug. 24, 2012), both of which granted motions to dismiss on standing and ripeness grounds.

(D.D.C. Jan. 25, 2013); *Persico v. Sebelius*, No. 1:12-CV-123-SJM, 2013 WL 228200 (W.D. Pa. Jan. 22, 2013); *Colo. Christian Univ. v. Sebelius*, 2013 U.S. Dist. LEXIS 2677 (D. Colo. Jan. 7, 2013); *Catholic Diocese of Peoria v. Sebelius*, No. 12-1276, 2013 U.S. Dist. LEXIS 1261 (C.D. Ill. Jan. 3, 2013); *Catholic Diocese of Biloxi, Inc. v. Sebelius*, No. 1:12CV158-HSO-RHW, 2012 U.S. Dist. LEXIS 183771 (S.D. Miss. Dec. 20, 2012). No court has issued a decision on a relevant ACA challenge since the NPRM was published.[5]

D.      *Plaintiff's Civil Action*

On May 21, 2012, Plaintiff filed a Complaint against Defendants alleging the following causes of action: the ACA and implementing regulations constitute a substantial burden on Plaintiff's religious exercise in violation of the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. §§ 2000bb-2000bb-4 (count I); the ACA and implementing regulations constitute a substantial burden on Plaintiff's religious exercise in violation of the Free Exercise Clause of the First Amendment to the U.S. Constitution (count II); the ACA and implementing regulations require the government's excessive entanglement into religion in violation of the Free Exercise and Establishment Clauses of the First Amendment (count III); the ACA and implementing regulations constitute religious discrimination in violation of the Free Exercise and Establishment Clauses (count IV); the ACA and implementing regulations constitute interference in Plaintiff's internal church governance in violation of the Free Exercise and Establishment Clauses (count V); the ACA and implementing regulations require compelled speech in violation of the Free Speech Clause of the First Amendment (count VI); the implementing regulations to the ACA were promulgated without

---

[5]Throughout this litigation, the parties have laudably updated the Court on the outcome of each ACA case.

notice-and-comment rulemaking and the government delegated its obligations to the Institute of Medicine in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.* (count VII); the ACA and implementing regulations require the government to take action that is arbitrary and capricious in violation of the APA (count VIII); and the ACA and implementing regulations are unlawful, in violation of the APA (count IX). Doc. 1, Compl. ¶¶ 124-235. The Complaint requests declaratory judgments finding that the ACA and implementing regulations violate the RFRA and the First Amendment as applied to Plaintiff; a declaratory judgment that the ACA and implementing regulations violate the APA; an injunction prohibiting the government from enforcing the ACA and implementing regulations against Plaintiff; an order vacating the ACA and implementing regulations; and expert and attorney's fees. *Id.* at ¶¶ 14, 107, prayer.

Following the Complaint, Defendants jointly filed a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. Doc. 9, Mot. The Motion seeks dismissal on the basis that Plaintiff lacks standing to challenge the ACA and implementing regulations and that the issues raised within the Complaint are nonjusticiable as they are not yet ripe. *Id.* Following the parties' substantial briefing, the Court requested and received supplemental briefing on several key issues.[6] Docs. 42, 49, and 50. The Motion has now been fully briefed. By prior Order, this Court denied without prejudice a motion (doc. 12) by the American Center for Law and Justice and seventy-nine Members of the United States Congress to appear as amicus curiae, concluding that the named parties adequately and sufficiently presented the arguments and perspectives relevant to the Motion to Dismiss and that the Movants' proposed amicus curiae brief would not further assist

---

[6]During the supplemental briefing period, the government issued the NPRM. The Court did not request further briefing, though Defendants applied the NPRM to this case in their additional brief. Doc. 49.

the Court in resolving the issues at hand. Doc. 17.

## II.

## LEGAL STANDARDS

Federal courts have the power to decide only actual cases or controversies. U.S. Const. art. III, § 2; *Chafin v. Chafin*, __ U.S. __, No. 11-1347, 2013 U.S. LEXIS 1122, at *12-13 (Feb. 19, 2013). "The justiciability doctrines of standing, mootness, political question, and ripeness all originate in Article III's case or controversy language." *Choice Inc. v. Greenstein*, 691 F.3d 710, 715 (5th Cir. 2012) (internal quotation marks omitted). Defendants base their Motion to Dismiss for Lack of Jurisdiction on Plaintiff's alleged lack of standing and the nonjusticiability of Plaintiff's unripe claims. Standing and ripeness are required elements of subject matter jurisdiction and are therefore properly challenged on a Federal Rule of Civil Procedure 12(b)(1) motion to dismiss. *See Xerox Corp. v. Genmoora Corp.*, 888 F.2d 345, 350 (5th Cir. 1989); *WesternGeco L.L.C. v. Ion Geophysical Corp.*, 776 F. Supp. 2d 342, 350 (S.D. Tex. 2011). A court must dismiss a case for lack of subject matter jurisdiction under Rule 12(b)(1) where it lacks the statutory or constitutional power to adjudicate the case. *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998).

A party moving for dismissal under Rule 12(b)(1) may bring either a "facial" or "factual" attack on the existence of subject matter jurisdiction. *Williamson v. Tucker*, 645 F.2d 404, 412 (5th Cir. 1981); *see Barrett Computer Servs., Inc. v. PDA, Inc.*, 884 F.2d 214, 220 n.5 (5th Cir. 1989). Defendants here base their jurisdictional contest on the face of Plaintiff's Complaint. Doc. 9, Mot. at 10-11. When a facial attack is raised against subject matter jurisdiction, "the plaintiff is left with safeguards similar to those retained when a Rule 12(b)(6) motion to dismiss for failure to state a claim is raised–the court must consider the allegations in the plaintiff's complaint as true."

*Williamson*, 645 F.2d at 412; *King v. Life Sch.*, 809 F. Supp. 2d 572, 577 (N.D. Tex. 2011). Accordingly, the Court treats Plaintiff's allegations as true, but disregards legal conclusions couched as statements of fact. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986). It is the party invoking jurisdiction, and not the party moving for dismissal, who bears the burden to establish the court's subject matter jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *In re Eckstein Marine Serv.*, 672 F.3d 310, 314 (5th Cir. 2012).

## III.

## ANALYSIS

The government moves to dismiss this action on standing and ripeness grounds. The Court addresses each issue, in turn, below.

A.      *Standing*

The standing inquiry is a threshold jurisdictional issue and focuses on the ability of a particular party to bring claims before a federal court, not on the issues on which adjudication is sought. *Warth v. Seldin*, 422 U.S. 490, 498 (1975). The standing doctrine is in place to ensure that "there is a real need to exercise the power of judicial review in order to protect the interests of the complaining party" because, "[w]here that need does not exist, allowing courts to oversee legislative or executive action would significantly alter the allocation of power away from a democratic form of government." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (internal quotation marks and alteration omitted). For Article III standing to exist, three fundamental constitutional prerequisites must be satisfied: (1) the plaintiff must have suffered an injury in fact, (2) the injury must have a causal connection to the defendant's conduct, and (3) it must be likely, and not merely speculative, that the injury suffered will be redressed by a decision favorable to the plaintiff. *Defenders of Wildlife*,

504 U.S. at 560-61. Certain prudential requirements also bear on the question of standing. *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 474-75 (1982). A party may not raise claims on behalf of third-parties not before the court or complain of generalized grievances, and the complainant must fall within the zones of injury and interest contemplated by the statute or constitutional provision at issue. *Id.*; *Apache Bend Apartments, Ltd. v. United States*, 987 F.2d 1174, 1176 (5th Cir. 1993) (en banc). These constitutional and prudential limitations exist in injunctive and declaratory relief cases. *Camreta v. Greene*, 131 S. Ct. 2020, 2041 (2011); *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126-27 (2007); *Summers*, 555 U.S. at 493.

A plaintiff's standing to bring a cause of action is assessed at the time the suit was filed. *Davis v. FEC*, 554 U.S. 724, 734 (2008) ("While the proof required to establish standing increases as the suit proceeds, the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." (citing cases)); *Defenders of Wildlife*, 504 U.S. at 571 n.4 (noting the Court's "longstanding rule that jurisdiction is to be assessed under the facts existing when the complaint is filed"); *Pederson v. La. State Univ.*, 213 F.3d 858, 870 (5th Cir. 2000). Events that occur subsequent to the filing of a complaint will not prevent a plaintiff from establishing standing which existed at the time of the pleadings. *See Smith v. Sperling*, 354 U.S. 91, 93 (1957) ("It is quite clear, that the jurisdiction of the Court depends upon the state of things at the time of the action brought, and that after vesting, it cannot be ousted by subsequent events." (citing *Mollan v. Torrance*, 22 U.S. 537, 539 n.1 (1824))); *Freeport-McMoRan, Inc. v. K N Energy, Inc.*, 498 U.S. 426, 428 (1991) ("We have consistently held that if jurisdiction exists at the time an action is commenced, such jurisdiction may not be divested by subsequent events."); *Carr v. Alta Verde Indus., Inc.*, 931 F.2d 1055, 1061 (5th Cir. 1991); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*

*(TOC), Inc.*, 528 U.S. 167, 189-92 (2000) (comparing standing with the doctrine of mootness, which is affected by subsequent events).

The government does not challenge Plaintiff's ability to demonstrate the traceability or redressability elements of the constitutional standing doctrine, nor does it argue against Plaintiff's prudential standing. The sole inquiry is whether Plaintiff has actually suffered or will imminently suffer an injury in fact from Defendants' enactment of the ACA and implementing regulations.

An "injury in fact" is an injury that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Defenders of Wildlife*, 504 U.S. at 560. "A party facing prospective injury has standing to sue where the threatened injury is real, immediate, and direct." *Davis*, 554 U.S. at 734 (citing *Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)). "A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement. But one does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending that is enough." *Babbitt v. UFW Nat'l Union*, 442 U.S. 289, 298 (1979) (internal quotation marks and alternations omitted).

Plaintiff explicitly advances two injuries upon which it has standing for all of its claims: its imminent injury in the form of future impairment of its First Amendment rights and actual injury in the form of the inability to prepare its 2014 health plan. Doc. 13, Resp. at 9-16. The Court also discerns allegations of a third injury: the actual or imminent injury arising from several of the APA claims. The Court addresses the sufficiency of each of these alleged injuries, in turn, below.

1.      Imminent Injury from Enforcement of the ACA

Plaintiff alleges in its pleadings that enforcement of the ACA and implementing regulations will cause imminent injury to Plaintiff in the form of burdening and interfering with its exercise of

religion and right of free speech. *See, e.g.*, doc. 1., Compl. ¶¶ 130, 140-141, 181. Defendant insists that the ACA's implementing regulations are undergoing amendment to address the very concerns raised by Plaintiff, so it is unlikely that Plaintiff will be required to comply with the ACA or suffer the alleged imminent injuries to its First Amendment rights.[7]

As an initial matter, Plaintiff surmises that the substance of Defendants' Motion applies only to some of its regulatory challenges but not to its challenges to the religious employer exemption. Doc. 13, Resp. at 7-8. Plaintiff basis its belief on language from the ANPRM, which it construes to reject the possibility of an amendment to the religious employer exemption. *Id.* The Court does not agree with Plaintiff's interpretation of the ANPRM as foreclosing amendment to the exemption. Accordingly, the government's arguments are certainly relevant to all of Plaintiff's causes of action.

Some courts have decided that entities lack standing to challenge the ACA on the basis that they will not suffer imminent injury due to their grandfathered or exempt status. *See Catholic Diocese of Peoria*, 2013 U.S. Dist. LEXIS 1261, at *12-13 (decided on ripeness grounds but concluding that grandfathered status would probably prevent standing); *Nebraska*, 877 F. Supp. 2d at 791 (requiring plaintiffs to plead specific facts that they are not grandfathered and therefore subject to the requirements that are alleged to cause them injury); *Roman Catholic Archdiocese of N.Y.*, 2012 U.S. Dist. LEXIS 172695, at *35-36 (dismissing two plaintiffs because they were protected under the grandfather clause). As an initial matter, the parties agree that Plaintiff is not protected by the

---

[7]Plaintiff opines that Defendants confuse the doctrine of standing with mootness, because the effect of the "potential for change in the law raises only a mootness question." Doc. 13, Resp. at 16 n.19. Defendants prevail upon the Court to "reject plaintiff's attempts to recast defendants' jurisdictional arguments as questions of mootness" because this case "raises quintessential standing and ripeness questions." Doc. 16, Reply at 15 n.11. The Court agrees with Defendants in that their Motion properly invokes Plaintiff's standing to sue and the ripeness of Plaintiff's pleadings but not mootness.

grandfather clause and thus is not exempted from the ACA coverage requirements on that basis. 26 C.F.R. § 54.9815-1251T(a)(1)(i) (Treasury); 29 C.F.R. § 2590.715-1251(a)(1)(i) (Labor); 45 C.F.R. § 147.140(a)(1)(i) (HHS). But, Plaintiff has not plead whether it believes it is a religious employer protected by the exemption clause, 45 C.F.R. § 147.130(a)(1)(iv)(B). Indeed, Plaintiff submits that it is "unclear" whether it will qualify for the exemption. Doc. 1, Compl. ¶ 38. The government also refuses to take a position on the issue. Doc. 9, Br. at 14 n.8 (noting Plaintiff's uncertainty as to the application of the exemption, but arguing that this "concern is irrelevant at this stage" in light of the safe harbor provision). The Court observed that, under the ANPRM, which is not binding law, the government contemplates a "Catholic diocese," specifically, as qualifying for the religious employer exemption. 77 Fed. Reg. at 16,502. Thus, despite the reasoning supporting Plaintiff's concern that it may not qualify as a "religious employer," there appeared to the Court a distinct possibility that Plaintiff might qualify for the exemption. The Court requested supplemental briefing from the parties on whether the fact that neither party knows if Plaintiff is protected by the currently-enacted religious employer exemption is itself a contingency that affects Plaintiff's ability to establish the imminence of injury.[8] Doc. 42, Order at 2 (citing *Clinton v. City of N.Y.*, 524 U.S. 417, 430-31

---

[8]The Court also requested the parties' positions on how an entity qualifies under the religious employer exemption, i.e., whether the entity must apply for the exemption or self-certify as exempt. Doc. 42, Order at 2. The government clarified that no application or self-certification for exemption is required, but rather that an employer who qualifies under the requirement "is simply exempt." Doc. 49, Supp. Br. at 2; *Chase Bank USA, N.A. v. McCoy*, 131 S. Ct. 871, 880 (2011) ("Under *Auer v. Robbins*, 519 U.S. 452 (1997), we defer to an agency's interpretation of its own regulation, advanced in a legal brief, unless that interpretation is 'plainly erroneous or inconsistent with the regulation.'"). Plaintiff responded that it has alleged that the exemption is unconstitutional regardless of the method of administration, doc. 50, Supp. Br. at 3, but that argument is inconsistent with its pleadings, as several of the causes of action explicitly invoke the certainty of an "intrusive and potentially costly governmental investigation into whether, in the Government's view," Plaintiff is a "religious employer" and thus exempt. *See, e.g.*, doc. 1, Compl. ¶ 11. Further, in light of the government's explanation of the administration of the exemption, it appears that Plaintiff need not submit to any investigative process. In any event, Plaintiff has challenged the regulations

- 16 -

(1998); *ACLU v. Alvarez*, 679 F.3d 583, 593-94 (7th Cir. 2012); *Comsat v. FCC*, 250 F.3d 931, 936 (5th Cir. 2001)).

The issue was substantially clarified by the parties' additional briefs. Plaintiff convincingly compared this case to *Clinton v. City of New York*, in which the Supreme Court rejected the government's contention that a pending application for an exemption from the Balanced Budget Act affected the plaintiff's ability to challenge the potential, immediate liability otherwise imposed by that law. 524 U.S. at 430-31. Here, the fact that the parties are unclear whether Plaintiff will fall under the religious employer exemption as currently enacted–and the fact that Plaintiff failed to take a stand in its pleadings on whether it is exempt–should similarly have no effect on Plaintiff's ability to challenge its potential liability under the ACA. Further, Plaintiff points out that it is the very nature of pre-enforcement lawsuits that enforcement of a law against the complainant is simply a possibility of enforcement, *see ACLU*, 679 F.3d at 593, which is the case here given that the government has not foresworn the possibility that Plaintiff will ultimately be required to provide preventive services coverage in violation of its touted religious beliefs. Finally, Plaintiff rightfully suggests that "it would be fundamentally unfair to require a litigant to subject itself to an unconstitutional regulation before allowing the litigant to establish standing." Doc. 50, Supp. Br. at 9. The Court is convinced, based on the parties' supplemental briefing, that their uncertainty as to whether Plaintiff would be exempt

---

in part under the expectation that the fact that it serves and employs individuals outside of its faith disqualifies it from being exempt under the second and third requirements of 45 C.F.R. § 147.130(a)(1)(iv)(B). And, of course, even if Plaintiff accepts the government's statement that it can consider itself exempt, Plaintiff would always be subject to later review by the agencies, who would ultimately determine whether Plaintiff appropriately complied with the regulations.

from the regulation is not a contingency that itself affects Plaintiff's ability to establish standing.[9]

Because Plaintiff's health plan is not grandfathered and because Plaintiff believes it may not qualify as an exempt religious employer, Plaintiff contends that enforcement of the ACA and its implementing regulations is likely and that the harm to Plaintiff's religious exercise and free speech is imminent. These alleged imminent harms are sufficient to confer standing to sue. *Davis*, 554 U.S. at 734; *Defenders of Wildlife*, 504 U.S. at 560. Nonetheless, it has been the government's contention that, even if Plaintiff is not shielded from the ACA coverage requirements under the religious employer exemption, the Court should decide that Plaintiff's injury is not imminent because the regulations are in the process of being amended to address the very concerns Plaintiff raises in its pleadings. Doc. 9, Br. at 1-2. According to the government, the promise of these changes is evident by a combination of (1) the publication of the ANPRM, (2) the implementation of the temporary enforcement safe harbor, and (3) the government's own representations to this Court and others. *Id.*

The Court agrees with Plaintiff that publication of the ANPRM is insufficient to undermine the imminence of Plaintiff's alleged injuries. The ANPRM merely states that the government expects to address concerns similar to those raised by Plaintiff and solicits comment on the same. 77 Fed. Reg. 16,501. The ANPRM is not a proposed amendment and does not proffer contents or

---

[9] This analysis differs slightly from other courts' requirements that plaintiffs plead specific facts showing that they are not exempt by way of the grandfather clause. *See, e.g.*, *Nebraska*, 877 F. Supp. 2d at __, 2012 U.S. Dist LEXIS 104419, at *39-40. That distinction, however, may be necessary because the grandfather clause presents an objective inquiry, whereas the religious employer exemption appears to be fluid and subjective. Furthermore, Plaintiff does not challenge the process of determining whether an entity is exempt as grandfathered, but it explicitly challenges the actual means necessary for it and/or the government to determine whether it is an exempt religious employer. The Court concludes that these distinctions explain the disparate pleading requirements.

substance of a proposed amendment. There is no concrete evidence to indicate that the government is reversing its course. *See API v. EPA*, 683 F.3d 382, 388 (D.C. Cir. 2012). Although the Court cannot say that every ANPRM would be insufficient to indicate a shift in administrative policy, the ANPRM relevant to this case provides no specifics to quash Plaintiff's fear of enforcement or to disprove the imminence of Plaintiff's injury upon enforcement of the current, final regulations.

Like the ANPRM, the safe harbor provision also does not alter the substantive coverage requirements or prevent enforcement indefinitely. 77 Fed. Reg. 8725. Instead, it merely postpones enforcement of the final regulations for a short period of time, until Plaintiff's new plan period begins on January 1, 2014. "Where the inevitability of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect." *Reg'l Rail Reorganization Act Cases*, 419 U.S. 102, 143 (1974); *see New York v. United States*, 505 U.S. 144, 175 (1992); *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 581 (1985); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 536 (1925); *Thomas More Law Ctr. v. Obama*, 651 F.3d 529, 537 (6th Cir. 2011). Further, the temporary safe harbor provision at issue here is a mere public statement and has not been made official or binding through codification. *See Va. Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 388 (4th Cir. 2001)(holding that a "policy of nonenforcement, adopted by the [agency] in a closed meeting, is somewhat more formal than [a] promise made during litigation" but that, on the other hand, the "policy is not contained in a final rule that underwent the rigors of notice and comment rulemaking" and "do[es] not carry the binding force of law"). Although the temporary enforcement safe harbor may provide some support for the promises made in the ANPRM, it is not enough to undermine a plaintiff's standing when no law or tangible proposed amendment exists that would indicate that the

plaintiff will be beyond the reach of enforcement of the current law.

More troubling to the Court is the government's third contention that its promises of future non-enforcement against Plaintiff are sufficient to prove that Plaintiff has no standing to challenge the current law. *See* doc. 49, Supp. Br. at 3; doc. 31-1, Resp. at 3-4 (representing "that the government will never enforce [the regulations] in their current form against the plaintiff here"). The government suggests, and several other federal courts have agreed, *see, e.g.*, *Wheaton Coll.*, 703 F.3d at __, 2012 U.S. App. LEXIS 26716, at *7-9, that if the government makes a statement before the Court that the regulations in their current form will "almost certainly" never be enforced against Plaintiff or that the amended regulations will address all of Plaintiff's concerns, the Court may take that representation as an eternal, factual truth, and the Plaintiff must rely upon that promise. *See, e.g.*, doc. 16, Reply at 4. But a string of promises does not an actuality make. First, the government's policies, plans, and representatives could change or cease to exist at any time. "[T]here is nothing that prevents the State from changing its mind. It is not forever bound, by estoppel or otherwise, to the view of the law that it asserts in this litigation." *Vt. Right to Life Comm. v. Sorrell*, 221 F.3d 376, 383 (2d Cir. 2000) (dismissing an argument that a plaintiff lacked standing "because the State has no intention" of enforcing the law against the plaintiff); *N.H. Right to Life PAC v. Gardner*, 99 F.3d 8, 15 (1st Cir. 1996) (finding a credible threat of prosecution where "nothing prevents the Commission from enforcing its rule at any time with, perhaps, another change of mind of one of the Commission," despite a promise of nonenforcement made by the state during litigation (citing *Chamber of Commerce v. FEC*, 69 F.3d 600, 603 (D.C. Cir. 1995))); *Eckles v. City of Corydon*, 341 F.3d 762, 768 (8th Cir. 2003). Second, the substance of the government's statement is empty. The government has not said, for example, that it will never require Plaintiff to provide contraceptives

or other preventive services abhorrent to Plaintiff. The government could amend the regulations in a way that has no bearing on Plaintiff's concerns and then enforce the coverage provisions against Plaintiff without violating its promise that the regulations "in their current form" would not be enforced against Plaintiff.[10] Courts may afford deference to some government representations made before a court. *See Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 325 (5th Cir. 2009) ("Without evidence to the contrary, we assume that formally announced changes to official governmental policy are not mere litigation posturing."). But representations of this nature–extremely broad and lacking substance–should *never* be enough to strip a plaintiff of standing. In *Abbot Laboratories v. Garden*, the Supreme Court noted its skepticism of government representations that attempted to diminish the plaintiff's standing to challenge a provision for criminal sanctions under the Federal Food, Drug, and Cosmetic Act:

> The Government further contends that the threat of criminal sanctions for noncompliance with a judicially untested regulation is unrealistic; the Solicitor General has represented that if court enforcement becomes necessary, "the Department of Justice will proceed only civilly for an injunction or by condemnation." We cannot accept this argument as a sufficient answer to petitioners' petition. This action at its inception was properly brought and this subsequent representation of the Department of Justice should not suffice to defeat it.

387 U.S. 136, 154 (1967) (internal alteration omitted). The Court concludes that the government's unimpressive representations that the current regulations will never be enforced against Plaintiff and that amended regulations will be issued and will likely address Plaintiff's concerns are too broad, unspecific, and unsupported to entice this Court to conclude that Plaintiffs will not be imminently

---

[10]The government has apparently declined to enter into a binding, enforceable stipulation with Plaintiff in this case to promise that it will not require Plaintiff to cover contraception and other preventive services for its employees. Doc. 50-1, Proposed Stipulation.

injured upon enforcement of the current regulations.

Defendants' supplemental briefing suggests that the NPRM has bearing on Plaintiff's standing. Doc. 49, Supp. Br. at 4. While true that Defendants made good on their promise to issue proposed amendments, the NPRM was published after the filing of this case and therefore has no bearing on whether Plaintiff adequately alleged its standing to sue. *See Davis*, 554 U.S. at 734. As explained above, the Court must turn a blind eye to the benefit of hindsight when analyzing a plaintiff's standing to sue. The Court therefore concludes that Plaintiff has established an imminent injury to its First Amendment rights.

2.    Actual Injury of Ability to Plan

Plaintiff also alleges that it has suffered an actual, present injury in its inability to plan ahead to determine the required scope of its self-insured health plan coverage. Doc. 13, Resp. at 6, 13. Plaintiff insists that the ANPRM "does not relieve the burden and costs of planning and preparing for the current law, nor the present uncertainty that has affected and is affecting the Diocese's operations" and thus that the ACA imposes a "present impact" on Plaintiff. *Id.* at 13. Injuries related to planning for future laws or similar legal contingencies are not often sufficient to establish standing. "Mere economic uncertainty affecting the plaintiff's planning is not sufficient to support premature review." *Wilmac Corp. v. Bowen*, 811 F.2d 809, 813 (3d Cir. 1987); *Tenn. Gas Pipeline Co. v. FERC*, 736 F.2d 747, 751 (D.C. Cir. 1984) (dismissing Plaintiff's alleged "planning insecurity"); *Bethlehem Steel Corp. v. U.S. EPA*, 536 F.2d 156, 162 (7th Cir. 1976) ("[C]laims of uncertainty in their business and capital planning are not sufficient to warrant our review of an ongoing administrative process.").

Plaintiff cites cases that have found actual injury based on the necessity of preparation, but those cases are distinguishable from and much more compelling than the facts plead here. Further,

Plaintiff admits that it has not decided whether it will simply pay the fines for violating the ACA rather than provide the required health coverage, whether it will overhaul its organizational structure to qualify as a religious employer, or whether it will provide the mandated coverage despite its religious beliefs. Doc. 1, Compl. ¶¶ 118-122. Although Plaintiff alleges that it "requires time to budget for any such additional expenses" should it choose to pay the fines and penalties and not provide coverage, *see id.* ¶ 121; doc. 13, Resp. at 14-15, that course of action would not involve the sort of planning hardship that some cases have recognized as adequate to confer standing. *See, e.g.*, *PNGTS Shippers' Group v. FERC*, 592 F.3d 132, 138 (D.C. Cir. 2010) (distinguishing *Great Lakes Gas Transmission Co. v. FERC*, 984 F.2d 426, 431 (D.C. Cir. 1993)). Accordingly, the Court discounts Plaintiff's alleged preparation injury as a basis for its standing.

3.     Injury Related to APA Violations

Finally, Plaintiff implicitly pleads injury related to Defendants' alleged violations of the APA (Counts VII, VIII, and IX of the Complaint). Plaintiff does not detail its standing to bring the APA claims, because Plaintiff maintains that Defendants' Motion does not challenge standing on those causes of action. Doc. 13, Resp. at 7. The Court disagrees with Plaintiff's characterization of the scope of Defendant's Motion. Defendant's arguments are certainly relevant to Counts VIII and IX because an amendment to the regulations may dispose of any allegations that the definition of "religious employer" is not in harmony with other federal laws or that the "preventive services" includes abortions. In any event, Defendant explicitly certifies that its Motion was intended to apply to all causes of action raised in the pleadings, doc. 16, Reply at 15, so the Court will consider its Motion as applying to the APA claims.

"Agency action made reviewable by statute and final agency action for which there is no

other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. At the time Plaintiff filed its lawsuit, the ACA implementing regulations were final because they were implemented with an effective enforcement date and because no actual proposed amendment had been issued which would contradict the final agency policy. The Court agrees that Plaintiff has standing with respect to the APA claims (Counts VII, VIII, and IX) because the alleged procedural rulemaking violations ultimately led to a preventive care regulation that is claimed to violate several rights held by Plaintiff. As noted above, the Court may not consider the post-pleading NPRM as evidence that the regulations are not final.

In conclusion, the Court determines that, at the time Plaintiff filed this suit in August 2012, Plaintiff had standing to challenge the injury imminent to it upon commencement of the enforcement of final regulations in their current form.

B.     *Ripeness*

Given that Plaintiff has established its standing to bring this lawsuit, the Court turns to the government's alternative argument that the Court lacks subject matter jurisdiction to review the case because the issues raised within the Complaint are not yet ripe. Doc. 9, Mot. at 15. Although Plaintiff protests that the Motion does not apply to several of its claims, *see* doc. 13, Resp. at 7, the Court has already rejected that argument and applies its ripeness analysis to this entire declaratory action.

The Fifth Circuit has recognized that although "applying the ripeness doctrine in the declaratory judgment context presents a unique challenge . . . , a declaratory judgment action, like any other action, must be ripe in order to be justiciable." *Orix Credit Alliance, Inc. v. Wolfe*, 212 F.3d 891, 896 (5th Cir. 2000); *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 544 (5th Cir. 2008)

("[A] ripeness inquiry is often required when a party is seeking pre-enforcement review of a law or regulation."); *Wright v. Spindletop Films, L.L.C.*, 830 F. Supp. 2d 280, 284 (S.D. Tex. 2011). A federal court may exercise jurisdiction over an actual controversy, but not premature or speculative issues. *Shields v. Norton*, 289 F.3d 832, 835 (5th Cir. 2002). "As a general rule, an actual controversy exists where 'a substantial controversy of sufficient immediacy and reality exists between parties having adverse legal interests.'" *Orix*, 212 F.3d at 896 (citing *Middle S. Energy, Inc. v. City of New Orleans*, 800 F.2d 488, 490 (5th Cir. 1986) (internal alteration omitted)). A case is ripe for adjudication if all remaining questions are legal and further factual development is unnecessary. *New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans*, 833 F.2d 583, 587 (5th Cir. 1987). A claim is not ripe if it is "rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (citations omitted).

The ripeness and standing inquiries are related in that they both share the constitutional prerequisite of imminent injury. *Prestage Farms, Inc. v. Bd. of Supervisors*, 205 F.3d 265, 268 n.7 (5th Cir. 2000) ("The justiciability doctrines of ripeness and standing often intersect because the question of whether a plaintiff has suffered an adequate harm is integral to both."); *WesternGeco L.L.C.*, 776 F. Supp. 2d at 351 ("In determining hardship, the doctrine of ripeness overlaps with the doctrine of standing's examination of whether a plaintiff has suffered a concrete injury." (internal quotation marks omitted)). Nonetheless, ripeness and standing serve separate and distinct purposes, and it is possible for claim to be unripe despite the existence of standing to raise that claim. *See, e.g.*, *S. Utah Wilderness Alliance v. Palma*, No. 11-4094, 2013 U.S. App. LEXIS 464 (10th Cir. Jan. 8, 2013); *Wheaton Coll.*, 703 F.3d at 551 (deciding a similar ACA challenge). When compared with standing:

This kindred doctrine [of ripeness] shifts to a temporal focus, timing review to secure

a fit of controversy and judicial resolution. Ripeness considers the fluidity of the events defining the dispute, such as whether the claim rests upon facts yet airborne or sufficiently upon facts that have found ground. It then balances the hardship of withholding decision and the fitness of the case for judicial resolution. Courts work best with historical facts and often must wait until history is determinable.

*Brooklyn Union Gas Co. v. FERC*, 190 F.3d 369, 373 (5th Cir. 1999). Ripeness is thus "an even closer question" than standing, because "[i]ts resolution is informed by additional circumstances that awaiting [further development of the case] may mitigate if not cure." *Id.* at 374. In simple terms, "standing is concerned with whether a proper party is bringing suit, while ripeness is concerned with whether the suit is being brought at the proper time." *Texas*, 497 F.3d at 496.

Accordingly, "[r]ipeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Nat'l Park Hospitality Ass'n v. DOI*, 538 U.S. 803, 807 (2003) (citing *Abbott Labs.*, 387 U.S. at 148-49); *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998); *Cent. & S.W. Servs. v. EPA*, 220 F.3d 683, 690 (5th Cir. 2000). The ripeness doctrine is designed to serve as "a tool that courts may use to enhance the accuracy of their decisions and to avoid becoming embroiled in adjudications that may later turn out to be unnecessary or may require premature examination of, especially, constitutional issues that time may make easier or less controversial." *Simmonds v. INS*, 326 F.3d 351, 357 (2d Cir. 2003).

"Ripeness doctrine 'is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.'" *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 286 (5th Cir. 2012) (citing *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 58 n.18

(1993)); *Stolt-Nielsen S. A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662 n.2 (2010) ("Ripeness reflects constitutional considerations that implicate Article III limitations on judicial power, as well as prudential reasons for refusing to exercise jurisdiction." (internal quotation marks omitted)); *see Rosedale Missionary Baptist Church v. New Orleans City*, 641 F.3d 86, 88-89 (5th Cir. 2011); *Allandale Neighborhood Ass'n v. Austin Transp. Study Policy Advisory Comm.*, 840 F.2d 258 (5th Cir. 1988). "[W]hen a court declares that a case is not prudentially ripe, it means that the case will be better decided later not that the case is not a real or concrete dispute affecting cognizable current concerns of the parties." *Connecticut v. Duncan*, 612 F.3d 107, 113-14 (2d Cir. 2010) (internal alterations omitted).

While standing to sue is assessed at the time of filing the complaint, "[i]n determining ripeness, a court may consider events that occurred after the filing of the complaint." *Newark Branch, NAACP v. Millburn Township*, No. 89-4219, 1990 U.S. Dist. LEXIS 17559, at *11 (D.N.J. Dec. 27, 1990) (citing cases); *Am. Motorists Ins. Co. v. United Furnace Co.*, 876 F.2d 293, 302 n.4 (2d Cir. 1989); *Henley v. Herring*, 779 F.2d 1553, 1555 (11th Cir. 1986). Courts reviewing decisions on ripeness frequently take into consideration the development of facts after the filing of the complaint and even after a decision issued by a lower court on the matter. *See, e.g.*, *Reg'l Rail Reorganization Act Cases*, 419 U.S. at 140 ("[S]ince ripeness is peculiarly a question of timing, it is the situation now rather than the situation at the time of the District Court's decision that must govern."); *Anderson v. Green*, 513 U.S. 557, 559 (1995); *Buckley v. Valeo*, 424 U.S. 1, 114 (1976); *Roark & Hardee*, 522 F.3d at 544-45.

Two key considerations exist for courts evaluating the ripeness of an action: "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."

*New Orleans Pub. Serv.*, 833 F.2d at 586 (quoting *Abbott Labs.*, 387 U.S. at 149); *Choice*, 691 F.3d at 715; *Placid Oil Co. v. FERC*, 666 F.2d 976, 981 (5th Cir. 1982). "Both aspects of the inquiry involve the exercise of judgment, rather than the application of a black-letter rule." *Nat'l Park Hospitality*, 538 U.S. at 814 (Stevens, J., concurring).

1.    Fitness of Issues for Decision

The first prong of the ripeness analysis is whether the issues are fit for judicial review. *Texas*, 497 F.3d at 496. "A challenge to administrative regulations is fit for review if (1) the questions presented are 'purely legal ones,' (2) the challenged regulations constitute 'final agency action,' and (3) further factual development would not 'significantly advance the court's ability to deal with the legal issues presented.'" *Id.* at 498-99 (citing *Nat'l Park Hospitality*, 538 U.S. at 812) (internal alterations omitted). "The baseline question is whether allowing more time for development of events would significantly advance our ability to deal with the legal issues presented or aid us in their resolution." *Doe v. Bush*, 323 F.3d 133, 138 (1st Cir. 2003) (internal quotation marks and alterations omitted).

The parties agree that the issues in this case are primarily legal. Doc. 9, Mot. at 19; doc. 13, Resp. at 17. They disagree as to the finality of the regulations. Although the ACA regulations are final in that they are published in the Code of Federal Regulations, courts must be "flexible" and "interpret[] the 'finality' element in a pragmatic way." *Abbott Labs.*, 387 U.S. at 149-50. The ANPRM and temporary safe harbor period could not dissuade the Court from concluding that Plaintiff sufficiently alleged imminent injury, but those facts certainly weigh in favor of finding that the case is not realistically ready for review. The promulgation of the NPRM, however, urges the undeniable conclusion that the case is not ripe. *See Ohio Forestry Ass'n*, 523 U.S. at 735 (concluding

that a challenge to an agency plan was not ripe because "the possibility that further consideration will actually occur before the [p]lan is implemented is not theoretical, but real" due to, *inter alia*, a notice of proposed rulemaking containing proposed amendments to the plan). "It would hardly be sound stewardship of judicial resources to decide this case now . . . given that an already published proposed rule, if enacted, would dispense with the need for such an opinion in a matter of months." *API*, 683 F.3d at 387-88 (holding that a challenge to a promulgated rule was not ripe because a proposed amendment to the rule was pending). That the enforcement of the current regulations "may never come to pass augurs against a finding of fitness." *Doe*, 323 F.3d at 139 (internal quotation marks omitted); *Toca Producers v. FERC*, 411 F.3d 262, 266 (D.C. Cir. 2005) (finding that an agency's action was final and the case presented purely legal issues, but holding that the case was not ripe). The proposed amendments, if adopted, spill into every aspect of the present case and constitute "reversal of course on [the agency's] part that, if adopted, would necessitate substantively different legal analysis and would likely moot the analysis we could undertake if deciding the case now." *API*, 683 F.3d at 388-89; *Ohio Forestry Ass'n*, 523 U.S. 735-36. The NPRM makes the ripeness analysis here more compelling than that of the other courts reviewing ACA challenges prior to the issuance of an actual, proposed amendment.

Although the issue was not addressed in any detail by the parties, the Court contemplates the distinction between the ripeness of Plaintiff's substantive claims, which will each evolve with the NPRM, and of Plaintiff's single procedural claim. In Count VII of its Complaint, Plaintiff alleges that Defendant violated the APA's notice-and-comment rulemaking procedure when it implemented the regulations and that Plaintiff suffered immediate injury upon its inability to comment. Doc. 1, Compl. at ¶¶ 198-210; doc. 13, Resp. at 8. Although the NPRM may impose a lesser impact on the ripeness

of the procedural claim compared with the other APA, First Amendment, and RFRA claims, the proposed amendments nonetheless illustrate that the challenged regulations are simply interlocutory. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (holding that an agency action is final where it is not "merely tentative" or of an "interlocutory nature"); *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992) (concluding that an agency action is final where "its impact is sufficiently direct and immediate," where it has "a direct effect on day-to-day business," and where it is not "tentative" (internal quotation marks and alterations omitted)). Finality is required even for claims that an agency failed to follow the notice-and-comment procedures. *See, e.g.*, *Anchorage v. United States*, 980 F.2d 1320, 1324-25 (9th Cir. 1992). As such, the Court concludes that Plaintiff's procedural APA claim is also not fit.

In light of the NPRM, and in viewing the fitness of the issues for consideration in a realistic and pragmatic way, the Court concludes that the case is not fit for review at this time.

2.    Hardship to Plaintiff Absent Consideration

The Court next turns to the issue of whether Plaintiff will suffer hardship if the Court withholds its consideration of the issues raised in its pleadings. "The Supreme Court has found hardship to inhere in legal harms, such as the harmful creation of legal rights or obligations; practical harms on the interests advanced by the party seeking relief; and the harm of being forced to modify one's behavior in order to avoid future adverse consequences." *Texas*, 497 F.3d at 499 (citing *Ohio Forestry Ass'n*, 523 U.S. at 734 (internal alterations and quotation marks omitted)); *Choice*, 691 F.3d at 715. In order to constitute a hardship, the impact of the regulations must be "sufficiently direct," resulting in an "immediate and significant change in the plaintiffs' conduct." *Abbott Labs.*, 387 U.S. at 152-53.

Defendants insist that there will be no hardship to Plaintiff if the case is dismissed on ripeness grounds, because the amendments to the regulations are not yet clear and because Plaintiff may never be subject to the objected-to requirements under the ACA. Defendants suggest that the only hardship "arises from plaintiff's own desire to prepare for a hypothetical (and unlikely) situation in which the forthcoming amendments to the preventive services coverage regulations do not sufficiently address its religious concerns." Doc. 9, Mot. at 21. Further, because the temporary enforcement safe harbor currently protects Plaintiff, enforcement of the regulations–in whatever form they may be–will not occur until January 1, 2014 if the safe harbor period is honored. *Id.* Thus, Defendant avers that Plaintiff will suffer no hardship absent the present resolution of its claims, because it is not yet facing a situation where it will be forced to choose between its religious beliefs or compliance with the regulations. *Id.*

Plaintiff responds that it will suffer an immediate hardship because it will be unable to sufficiently plan its compliance with the regulations in that it will have inadequate time to make effective decisions with respect to its insurance coverage. Doc. 13, Resp. at 22. Plaintiff declares that this "planning hardship" is real and tips the balance in favor of immediate adjudication. *Id.* (citing *Miller v. Brown*, 462 F.3d 312, 321 (4th Cir. 2006); *Wis. Pub. Power, Inc. v. FERC*, 493 F.3d 239, 263 (D.C. Cir. 2007)).

The Court does not discount the general desire for certainty and long-term planning, but no direct dilemma or Hobson's choice is faced by Plaintiff now. Plaintiff's argument "would effectively create a rule where any future event, however remote or speculative, could constitute a burden when a plaintiff claims that it must prepare now for this future contingency." *Cephalon, Inc. v. Sebelius*, 796 F. Supp. 2d 212, 218 (D.D.C. 2011). As the Court of Appeals for the D.C. Circuit has explained,

"[w]ere we to entertain anticipatory challenges pressed by parties facing no imminent threat of adverse agency action, no hard choice between compliance certain to be disadvantageous and a high probability of strong sanctions, we would venture away from the domain of judicial review into a realm more accurately described as judicial preview." *Tenn. Gas Pipeline Co.*, 736 F.2d at 751. For the same reasons this Court found that the "planning hardship" did not constitute an actual injury under the standing inquiry, the inability to prepare for contingencies is not a hardship that outweighs the unfitness for review of the issues in this case. Importantly, Plaintiff will be able to raise its claims in the future, when a regulation is final or when enforcement is initiated, and Plaintiff has an opportunity to participate in the amendment process now.

Accordingly, because the issues are not prudentially fit for review and because Plaintiff will not suffer hardship should the Court withhold a decision on the merits of this action, the Court concludes that the causes of action in the Complaint are not ripe. Dismissal is the appropriate action where a claim is not ripe. *See Ohio Forestry Ass'n*, 523 U.S. at 739 (deciding that the lawsuit was not ripe for review and remanding with instructions to dismiss it); *Colo. Christian Univ.*, 2013 U.S. Dist. LEXIS 2677, at *27 (observing no compelling support for the D.C. Circuit's unique historical practice of holding some unripe cases in abeyance rather than dismissing them).

## IV.

## CONCLUSION

For the above-stated reasons, the Court **GRANTS IN PART and DENIES IN PART** Defendants' Motion to Dismiss for Lack of Jurisdiction (doc. 9). The Complaint is dismissed in its entirety.

SO ORDERED.

SIGNED: February 26, 2013.

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE